UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

---

CHRISTOPHER D. JONES,

        Plaintiff,

        v.                                               Case No. 00-C-1024

JOANNE B. BARNHART,

        Defendant.

---

DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER
AND DISMISSING THE CASE

Plaintiff, Christopher D. Jones, seeks judicial review under 42 U.S.C. § 405(g) regarding the termination of his Supplemental Security Income (SSI) disability benefits. Jones had been receiving SSI benefits since January 1, 1990, under the childhood benefits standard in place at that time. (Tr. 87-88) In 1997, pursuant to Pub. L. 104-193, the Commissioner redetermined Jones eligibility for childhood SSI disability benefits. The Commissioner found that Jones did not meet the new childhood standard for disability and his eligibility for benefits ceased in September of 1997. (Tr. 12-16)

Jones appealed the termination of his benefits through the administrative appeals process. On February 12, 1999, he appeared pro se before Administrative Law Judge (ALJ) Marsha Stroup. (Tr. 216-253) ALJ Stroup denied Jones' claim, and the Appeals Council denied review. (Tr. 12-16) Jones retained counsel and appealed to this court. In July 17, 2001, this court granted the Commissioner's motion to remand Jones' case pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of new and material evidence. (Tr. 375-81)

Upon remand, ALJ Stroup held another hearing which resulted in denial of benefits on June 13, 2002, under the child and the adult standards. (Tr. 619)[1] Jones appealed the decision to the Appeals Council, which vacated ALJ Stroup's second decision because ALJ Stroup had declined Jones' request to hold a supplemental hearing to address psychological evidence the ALJ had obtained after the hearing. (Tr. 666-69) The Appeals Council remanded the case to a new ALJ, instructing that a supplemental hearing be held as requested by Jones, and that the ALJ place into the record two opinions from state agency doctors, along with any of Jones' recent mental health or physical treatment records and, if necessary, obtain an additional medical expert's report. Also, the ALJ was directed to give further consideration to whether the SSI medical listings apply to Jones as a child, and to determine the severity of Jones' impairments and residual functional capacity (RFC) as an adult. (Tr. 667-68)

ALJ Ira Epstein, the newly assigned ALJ, held a hearing on May 21, 2004, during which Jones, a psychological expert, and a vocational expert testified. (Tr. 318-55.) In addition, ALJ Epstein held a supplemental hearing on November 22, 2004, to address Jones' recent work history and earnings. (Tr. 358-72) On April 7, 2005, ALJ Epstein found that Jones was not disabled under the child and adult standards and was not entitled to SSI benefits. (Tr. 257-69) Jones now appeals to this court.

---

[1] As Jones was now 18 years old, ALJ Stroup determined Jones' disability under both the child and adult standards.

2

Case 2:00-cv-01024-CNC   Filed 11/16/06   Page 2 of 18   Document 49

FACTS

School Records

In 1996, a multi disciplinary team (consisting of a school psychologist, a social worker, Jones' learning disability teacher, and regular classroom teacher) issued a report on Jones. (Tr. 107-11) The report showed that Jones was in exceptional education for learning disabilities, his academic functioning was consistently below grade level, and his speech and language functioning were adequate. (Tr. 109) The team noted that Jones' intellectual functioning was within the low average to average range, (Tr. 109), and scores from a 1993 assessment indicated average potential. (WISC-III; PIQ 87-100) (Tr. 117)

On May 16, 1997, a learning disability specialist, Kathy Lein, completed a "School Activities Questionnaire" that showed Jones was in the "learning disabilities program, 7th grade," and was below grade level academically. (Tr. 73) Lein reported that Jones was well-liked and that his attention span and on-task behavior were within the normal range. (Tr. 73)

On March 1, 1998, Jones' learning disability teacher, Kim Lewis, reported in another "School Activities Questionnaire" that Jones was in eighth grade but working at a third grade level. (Tr. 83-84) She reported that he did not have any problems interacting with staff or students, his self-care skills were age appropriate, and that frequently his asthma caused him to be late or to miss class. (Tr. 83-94) Also, Lewis wrote that Jones was "benefitting from your services" and asked that the Department of Health & Social Services continue his benefits. (Tr. 84)

An "Individualized Education Program" team of Jones' teachers and a psychologist met on November 11, 1998, to evaluate Jones' development. (Tr. 214) At

3

that time, Jones was in special education programming for 80 percent of the day. (Tr. 201) The team noted that Jones' classroom work and informal testing showed that his language skills were at the third grade level and that his reading had improved to a fifth grade level. (Tr. 208) The team concluded that Jones' performance, although significantly below grade level in terms of academic achievement, was consistent with intellectual functioning in the low average range (Tr. 212) and that Jones did not have a cognitive disability. (Tr. 211)

School records show that Jones continued to receive special education services throughout the 2000-2001 school year for his learning disability. (Tr. 464-65, 490-511) The records revealed that Jones' attendance was very sporadic, making it difficult to assess his academic performance (Tr. 502), and that Jones continued to perform well below grade level in spelling and reading, although math appeared to be "a relative strength." (Tr. 208)

## Medical Records

Jones suffers from asthma and has received medical care for this condition on several occasions. On September 13, 1996, Jones was treated at the emergency room for a respiratory infection (Tr. 130); on October 13, 1996, he was treated for asthma with wheezing and shortness of breath (Tr. 126); on February 16, 1997, he was treated for an acute asthma attack (Tr. 123-24); and on April 21, 1997, Jones was diagnosed with asthmatic bronchitis. (Tr. 170) This same month, at Jones' yearly physical exam, his doctor reported that Jones' only active medical problem was asthma. (Tr. 169) Notes from Dr. Amy Person dated July 24, 1997, indicate that Jones' asthma was not well-controlled by a steroid inhaler. (Tr. 168)

4

On August 21, 1997, Jones returned to his doctor for a follow-up, having completed home health teaching for asthma with a visiting nurse. (Tr. 158) Jones reported feeling better, but still had some exercise intolerance and disturbed sleep due to allergies. *Id.* On October 23, 1997, Jones reported doing "pretty well," and his treating physician diagnosed "asthma, moderate persistence, with good control on current regimen." (Tr. 156) By January 15, 1998, Jones reported that he had no recent asthma exacerbations, and his doctor diagnosed "well controlled" asthma. (Tr. 155)

On May 8, 1998, Jones' mother expressed concern that Jones had a "nerve problem" and wanted to see if he needed to be on Ritalin. (Tr. 153) A pediatrician evaluated Jones and referred him to Children's Hospital Psychiatry Center for a possible anxiety or attention deficit hyperactivity disorder. (Tr. 143–44) The intake assessment at Children's Hospital, dated June 23, 1998, showed Jones was diagnosed with ruled-out ADHD, insomnia recurrent, and ruled-out avoidant personality. (Tr. 174.) The intake assessment referred to a report from the school M-Team stating that Jones has "ADHD like symptoms including forgetfulness, restless passive and socially introverted." (Tr. 173) On January 1, 1999, Dr. Hermann, at Children's Hospital of Wisconsin, prescribed Paxil for Jones. (Tr. 183) Treatment notes from August 10, 1998, show a diagnosis of anxiety disorder and asthma. (Tr. 416) A closing summary from Children's Hospital dated April 15, 1999, revealed Jones' diagnosis was anxiety, an ADHD history, and asthma. (Tr. 394)

On November 17, 2001, Jones was treated in the emergency room for a brief fainting episode. (Tr. 425-35) Jones denied any dizziness or other problem, and the physician determined that this episode was likely caused by dehydration. *Id.* Jones' follow-up physical examination was normal. *Id.*

5

State Agency Reports

From July 1997 to April 1998, four state agency psychologists reviewed the record and assessed Jones' functioning. (Tr. 139-42, 670-73) All opined that Jones did not have an impairment or combination of impairments that met, medically equaled or functionally equaled a listed impairment and that he was, therefore, not disabled and not entitled to childhood SSI. *Id.*

On March 27, 1998, James Paquette, PhD, a psychologist retained by the Social Security Administration, performed achievement and intelligence testing. (Tr. 134) Jones scored in the mildly retarded range on intelligence testing; Dr. Paquette noted this was a significant reduction from the 1996 assessment by the school multi disciplinary team and that this reduction could not be explained. (Tr. 135) However, Dr. Paquette also found that Jones' "fund of information" and practical reasoning were relative strengths, and that his abstract reasoning was in the non-retarded range. (Tr. 135) Paquette noted that Jones was affable, cooperative, and careful during the protocols, resulting in a valid estimate of ability. (Tr. 134)

On February 18, 2002, Joan Nuttal, PhD, performed a consultative psychological evaluation at the request of ALJ Stroup. (Tr. 550) This time Jones' IQ scores were in the low average range, with Dr. Nuttal noting that these scores may have been underestimates. (Tr. 554) Jones was reading at the fourth grade level, spelling at the second grade level, and doing arithmetic at the third grade level. (Tr. 556) Dr. Nuttal diagnosed Jones with "disorder of written expression, math disorder, and ADD – inattentive type, provisional." (Tr. 555) She found Jones to be relaxed, demonstrating sufficient social skills, and capable of functioning in a low-level employment job. (Tr.

6

552, 554-55) In a January 2005 letter, Jones' attorney notified ALJ Epstein that Jones was not seeking benefits beyond the date of Dr. Nuttal's examination. (Tr. 740)

Testimony

At the first hearing before ALJ Stroup on February 12, 1999, Jones' mother and his sister testified. (Tr. 218) Jones' mother reported that Jones was in L.D. programming (Tr. 223) and suffered from asthma (Tr. 229 – 230) and disturbed sleep. (Tr. 224, 227) Jones' sister added that Jones suffered from anxiety, was seeing a psychiatrist and school social worker (Tr. 234), and was at the second and third grade levels educationally, despite his efforts. (Tr. 239-40)

At the next hearing before ALJ Stroup on January 15, 2002, Jones and his stepfather testified. (Tr. 271-317) Jones testified that he had held two part-time jobs at nursing homes since quitting high school in the eleventh grade and now was working at McDonald's approximately 28 hours per week. (Tr. 280-84) Jones also testified that his asthma was fairly stable when he was on medication, although he became somewhat short of breath upon over-exertion. (Tr. 286-87) Jones' stepfather added that Jones still suffered from disturbed sleep (Tr. 307) and that he did not trust Jones using large machines, like a lawn mower or snow blower. (Tr. 309-10)

At the first hearing before ALJ Epstein on May 21, 2004, Jones, his sister, Dr. Hauer (a psychological expert), and John Schroeder (a vocational expert) testified. (Tr. 318-355) Jones reported that he was working at another McDonald's approximately 30 hours per week. (Tr. 322) He reported that sometimes he had difficulty keeping pace, he argued with his manager, he needed help with written instructions, but his manager still would make special accommodations for him. (Tr. 322-23; 332) Jones advised that he still experienced shortness of breath with exertion and would cry two to

7

three times per week due to frustration and anger. (Tr. 333-34, 336) Jones' sister confirmed Jones' frustration as well as his work situation and testified that she handled Jones' money, washed his clothes, and shopped for him. (Tr. 340-41) Dr. Hauer, the psychological expert, testified that Jones had low average intelligence, was functionally illiterate, but was not mentally retarded. (Tr. 337) According to Dr. Hauer, there was no conclusive evidence in the record to support a diagnosis of ADHD, significant anxiety or depression. (Tr. 345-46) John Schroeder, the vocational expert, testified that there were thousands of jobs in the Milwaukee area for an individual of Jones' age, education, and work experience, who is limited to light-exertion, unskilled, and routine positions in clean, irritant-free environments. (Tr. 347)

## STANDARD OF REVIEW

To obtain disability benefits under the Social Security Act, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Administration has adopted a sequential three-step test for determining whether a child claimant is disabled and a sequential five-step test for determining whether an adult claimant is disabled. 20 C.F.R. §§ 416.924, 416.920(a)(4).

Under the "child" test, the ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's impairment(s) meets, medically equals, or functionally equals one of the impairments listed in the Administration's

8

regulations, 20 C.F.R. pt. 404, subpt. P, app. 2 (the "listings"), for the required duration. 20 C.F.R. § 416.924.

Under the "adult" test, the ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity, (2) if not, whether the claimant has a severe impairment, (3) if so, whether the claimant's impairment(s) meets or equals one of the impairments listed in the Administration's regulations, 20 C.F.R. pt. 404, subpt. P, app. 1, as being so severe as to preclude substantial gainful activity, (4) if not, whether the claimant can perform his past relevant work, and (5) if not, whether the claimant can make the adjustment to other work based on his residual functional capacity (RFC). 20 C.F.R. § 416.920(a)(4); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant makes the necessary showing at steps one to three, he will be found disabled. If the impairment is not of such severity as to be presumptively disabling in the listings, the ALJ must consider at step four whether the claimant possesses the RFC to perform past work. If not, the burden shifts at step five to the Secretary to demonstrate that the claimant can successfully perform a significant number of other jobs that exist in the national economy. *Young*, 362 F.3d at 1000.

Under 42 U.S.C. § 405(g), the district court's review of the ALJ's decision is limited to determining whether the decision is supported by "substantial evidence" and is based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). This court cannot "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioners." *Lopez v.*

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Id.* The ALJ commits such an error if he fails to comply with the Commissioner's regulations and rulings. *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991).

In the decision, the ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability," *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992)), "build[ing] an accurate and logical bridge from the evidence to his conclusion," *id.* at 872. Although the ALJ need not discuss every piece of evidence, he cannot select and discuss only the evidence supporting the decision. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). A "sketchy opinion" may be sufficient, however, if it is clear the ALJ considered the important evidence and his reasoning can be traced. *Id.* at 787. The court will "give the opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir.2000) Shramek v. Apfel, 226 F.3d 809, 811 (7th Cir. 2000) (*quoting Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

DISCUSSION

Jones argues that the ALJ's decision must be reversed because: (1) the record filed with this court is incomplete because it is missing two reports from state agency physicians; (2) the ALJ did not properly evaluate his claim for childhood SSI disability benefits; (3) the ALJ did not determine the credibility of his testimony properly; and (4) the ALJ did not use substantial evidence but repeatedly relied upon speculation in his decision.

10

Jones asks this court to reverse the ALJ's decision and reinstate payment of his SSI benefits from July 31, 1997, to November 22, 2004. Alternatively, he asks this court to remand the case for a rehearing pursuant to 42 U.S.C. § 405(g) (sentence four) for a proper evaluation of his claim for SSI benefits, including a complete and fair development of the administrative record before the hearing.

First, the court considers whether the record is incomplete due to the omission of reports by Drs. Rosen and Rupert and whether this omission prejudices Jones and prevents this court from properly reviewing the ALJ's decision. As an initial matter, it is unclear why the Rosen and Rupert reports are missing from the record filed with this court.[2] It appears that they were part of the record as late as April 7, 2005, because ALJ Epstein referred to the reports in his decision. (Tr. 262) That being the case, the Commissioner is required to file with this court an administrative record that includes only "the evidence upon which the findings and decision complained of are based." 42 U.S.C. 405(g). Consequently, this court must decide whether the reports were material to the ALJ's decision and, if so, whether the reports are required for the court to review the ALJ's decision properly.

In determining Jones' mental capabilities, the ALJ considered all of his IQ scores, including those listed in the Rosen and Rupert reports from 1990-91. The ALJ noted the significant difference between the 1990-91 and 2002 scores. Jones' 2002 IQ was in the low average intelligence range, whereas his 1998 IQ was scored in the

---

[2] The missing reports are from 1990-91 and summarize the results of two psychological evaluations of Jones conducted by two state agency physicians, Drs. Rosen and Rupert, during the period when Jones first sought benefits.

11

extremely low (mildly mentally retarded) range.³ (Tr. 263) In support of the 2002 scores, ALJ Epstein referred to the IQ scores in the Rosen and Rupert reports from 1990-91, which also showed Jones to be in the low average range. (Tr. 263)

However, the Rosen and Rupert reports provide just one means of resolving the conflicts in Jones' IQ scores and determining his mental capabilities. Other evidence in the record corroborates the 2002 scores. Dr. Hauer, a state agency physician, testified in 2004 that Jones was not mentally retarded. (Tr. 265) In addition, school reports from 1993 described Jones as being of low average intelligence. Because the record included other evidence supporting the 2002 scores and this evidence was more recent, the court finds that the Rosen and Rupert reports were not material to the ALJ's determination of Jones' mental capabilities and the ALJ's final decision as to disability.⁴

Even if the court were to find that the IQ scores in the Rosen and Rupert reports were material to the ALJ's decision, the court is not persuaded that Jones is prejudiced by the absence of these reports from the record at this stage of the proceedings. The record includes several references to the Rosen and Rupert reports, all confirming the ALJ's summary of the information in these reports. The court does not see the value of prolonging this case based only on Jones' speculation as to what else the missing reports might add.

---

³ Dr. Paquette, who administered the 1998 test, could not explain why Jones scored substantially lower in 1998 versus 1990-91.

⁴ Listing 112.00(D)(10)(2005) (Medical Impairment - Childhood) provides as follows:
IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

12

Next, the court considers whether the ALJ properly evaluated Jones' claim for childhood disability benefits. In determining whether a claimant's impairments meet, or medically or functionally equal an impairment listing, an ALJ must discuss the listings by name and offer more than a perfunctory analysis of the listings. *Scott v. Barnhart*, 297 F3d 589, 595-96 (7th Cir. 2003). However, an ALJ's failure to explicitly refer to the relevant listing alone does not necessitate reversal and remand, when the court "can safely conclude the ALJ considered and applied the appropriate listing." *Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004).

Jones is correct that the ALJ did not specify the relevant SSA listings and that, although the ALJ did identify the current standard for evaluating childhood disability (Tr. 260), he failed to describe his analysis under this standard. Instead, the ALJ adopted ALJ Stroup's decision, which included the relevant SSA listings and explained why Jones no longer met, or medically or functionally equaled one of these listings under the childhood standard. (Tr. 265-66; Tr. 614-15)[5] The ALJ found no subsequent evidence that would contradict ALJ Stroup's decision. However, ALJ Epstein noted one major disagreement with ALJ Stoup's decision, finding that Jones should be considered illiterate for educational purposes. (Tr. 266) This disagreement indicates that ALJ Epstein evaluated the evidence and did more than automatically adopt ALJ Stroup's decision.

Ideally, ALJ Epstein would have explicitly stated his reasons for finding Jones was no longer disabled under the childhood standard, even if those reasons

---

[5] ALJ Stroup considered Jones' impairments as they related to three SSA impairment listings (112.05, 103.03, and 112.06). (Tr. 614-15) She explained why Jones did not meet or medically equal these listings, noting Jones' past treatment for anxiety and current treatment for asthma. (Tr. 614-15) Over the next page, ALJ Stroup applied the evidence to the six domains of functioning, concluding that Jones' impairments also did not functionally equal these listings. (Tr. 615)

13

mirrored those of the previous ALJ (Stroup). Nevertheless, it is clear from the record that ALJ Epstein reviewed the new evidence and concurred with the previous decision. Therefore, the court concludes that the ALJ properly analyzed Jones' claim under the childhood standard.

Jones also asks that this court consider whether the ALJs properly determined his credibility, based on the following two findings in the ALJs' decisions.

1. The ALJ's (Epstein's) finding that "[t]he claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of this decision." (Tr. 268)

2. The previous ALJ's (Stroup's) finding that "[t]he claimant's allegations of fatigue that is of a severity that prevents full-time employment are not supported by the objective medical evidence of record." This finding is relevant because ALJ Epstein incorporated by reference most of Stroup's decision in his own. (Tr. 618)

Generally, an ALJ's credibility determination is given special deference because the ALJ can observe the witness and thus is in a better situation to determine the witness' credibility. *Shramek*, 226 F.3d at 811. Reviewing courts do not disturb an ALJ's credibility determination unless the reasons the ALJ gives for her credibility determination "do not build an accurate and logical bridge between the evidence and the result," *id.*, or the ALJ's credibility determination does not comply with regulations, such as SSR 96-7p, *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). In a disability decision, an ALJ is not required to provide a "complete written evaluation of every piece of testimony and evidence" when analyzing under the disability standards. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995); *Rice,* 384 F.3d at 370.

14

With respect to ALJ Epstein, Jones argues that "[t]here is no section of the ALJ's decision that properly deals with credibility." (Pl. Br. 14) Essentially, Jones submits that ALJ Epstein did not "build a bridge" between the evidence and the finding that Jones' testimony about his limitations was not totally credible.

The court disagrees. The ALJ built a bridge between the evidence and his credibility finding when he discussed conflicts within Jones' testimony, and between Jones' testimony and other evidence.[6] (Tr. 264-66) For example, the ALJ noted an inconsistency with Jones' statement that his supervisor was demanding, which resulted in frequent conflicts at work, and Jones' statement that this same supervisor made special accommodations for him. (Tr. 266) Moreover, the ALJ observed that Jones was able to maintain substantial, gainful employment in 2002 despite his claims of fatigue. (Tr. 266.) It is obvious that these conflicts were considered by ALJ Epstein when finding that Jones' allegations regarding his limitations were not totally credible. Because the court can track the ALJ's reasoning regarding the evidence and the ALJ's finding, the court concludes that the ALJ's credibility determination was proper.

Because ALJ Epstein incorporated much of ALJ Stroup's decision into his own decision, Jones addresses ALJ Stroup's credibility determination and contends that ALJ Stroup "impermissibly required [him] to prove the severity of his impairments with objective medical evidence." Social Security Ruling 96-7p addresses credibility and identifies the two-step process for evaluating the credibility of testimony about symptoms, such as pain and fatigue, in disability claims:

---

[6] Because ALJ Epstein adopted most of ALJ Stroup's decision (Tr. 262 & 266), he likely deferred to ALJ Stroup's credibility determination of the witnesses at the hearings conducted by Stroup.

15

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms.
>
> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which symptoms limit the individual's ability to do basic work activities.
>
> [Under the Policy Interpretation of this ruling,] [i]f an individual's statements about pain or other symptoms are not substantiated by the objective medical evidence, the adjudicator must consider all of the evidence in the case record, including any statements by the individual and other person concerning the individual's symptoms. SSR 96-7p.

On its face, ALJ Stroup's finding seems to imply that she discounted the severity of Jones' complaints of fatigue based solely on a lack of objective medical evidence, in violation of SSR 96-7p.[7] However, the decision as a whole demonstrates that ALJ Stroup considered other evidence to determine the severity of the fatigue and the extent to which it limited Jones' ability to work.

First, ALJ Stroup stated that she found Jones' "ongoing, significant part-time work activity [was] particularly relevant evidence as to the severity of [Plaintiff's] impairments and the impact of his impairments on his general function." (Tr. 610-11) Second, Stroup gave weight to her impressions of the claimant at his hearing where he exhibited no outward evidence of any significant mental or physical limitations. (Tr. 611-12) As these statements demonstrate, Stroup determined the severity of Jones' fatigue

---

[7] It is not clear that "Step Two" of Ruling 96-7p applies to this case, given that the evidence does not indicate a medically-determinable underlying cause of the fatigue. In her decision, ALJ Stroup noted that Jones did not seek or receive treatment for his alleged fatigue and that she found no evidence in the record to suggest an organic basis for the fatigue. (Tr. 614) (see also Tr. 611 for Jones' stepfather's testimony that he could not describe a basis for this problem (Tr. 611))

16

and the extent to which it limited his ability to work based on more than just a lack of objective medical evidence. For this reason, the court finds that ALJ Stroup properly applied SSR 96-7p to the facts of this case to determine Jones' credibility.

Finally, the court considers whether ALJ Epstein relied on speculation and his own medical opinions rather than substantial evidence to support his finding that Jones was not entitled to SSI benefits. In a disability decision, an ALJ may draw "[r]easonable inferences," but may not use "presumptions, speculations, and suppositions." SSR 82-62. A decision based on speculation is not supported by substantial evidence. See *Ehrart v. Secretary of Health and Human Services*, 969 F.2d 534, (7th Cir. 1992). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.*

Jones characterizes as speculative several of the ALJ's conclusions; however, the court does not agree. On the whole, the court finds these conclusions to be reasonable inferences supported by the evidence. For example, the ALJ concluded that the intake diagnoses at Children's Hospital were based largely on complaints by Jones' mother. (Tr. 262) This conclusion appears reasonable, given that Jones' mother participated in the intake interview and no mental status examination results were provided. (Tr. 262) As another example, when the ALJ was presented with conflicting reports from Jones' teachers, the ALJ concluded that one of the teachers may be advocating for Jones and, therefore, may not be completely objective. (Tr. 263) This conclusion appears reasonable, given that this teacher ended her questionnaire with a plea to continue Jones' benefits and focused on Jones' asthma difficulties at a time when the medical records suggested otherwise. (Tr. 263)

17

As stated earlier, the court reads the ALJ's decision from a common sense perspective rather than "nitpicking" at it. As a consequence, it finds that the ALJ demonstrated the reasoning underlying his decision based on substantial evidence from the record (of over 700 pages of evidence from doctors, psychologists, teachers, Jones' family, and Jones himself, covering nearly 15 years of his life).

Now, therefore,

IT IS ORDERED that the decision of the Commissioner is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 16th day of November, 2006.

BY THE COURT

s/ C. N. CLEVERT, JR.
C. N. CLEVERT, JR.
U. S. District Judge